**George M. UNDERWOOD, Jr., and The Underwood Foundation**

v.

**UNITED STATES of America.**

**No. CA 3–77–0429–C.**

United States District Court,
N. D. Texas,
Dallas Division.

Nov. 14, 1978.

Phillip A. Wylie, Neil J. O'Brien and T. S. Baumgardner, Wynne & Jaffe, Dallas, Tex., for plaintiffs.

William W. Guild, Dallas, Tex., G. Thomas Rhodus, Atty., Steven Shapiro, Atty., Tax Div., Dept. of Justice, Washington, D. C., Kenneth J. Mighell, U. S. Atty., Martha Joe Stroud, Asst. U. S. Atty., Dallas, Tex., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

WILLIAM M. TAYLOR, Jr., District Judge.

This cause came on for hearing before the Court, sitting without a jury, on February 23, 1978. Upon consideration of the stipulations of the parties, the testimony of the witnesses, and the exhibits admitted into evidence, the Court makes the following findings of fact and conclusions of law, in accordance with the provisions of Rule 52, Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. This is a suit for refund of federal excise taxes, penalties, and interest assessed and collected from Plaintiff George M. Underwood, Jr. (hereinafter "Underwood"), in the total amount of $28,655.07 with respect to the years 1970, 1971, 1972, 1973, and 1974, and from Plaintiff Underwood Foundation (hereinafter the "Foundation"), in the total amount of $7,572.65 with respect to its taxable year ended May 31, 1972, and for costs and attorneys fees.

2. Underwood resides at 4005 Gillon, Dallas, Texas.

3. The Foundation is a tax-exempt charitable foundation as described in Section 501(c)(3) of the Internal Revenue Code of 1954 (26 U.S.C.) (hereinafter the "Code"). Its principal place of business is 12700 Park Central Place, Suite 1606, Dallas, Texas.

4. The Internal Revenue Service (hereinafter the "IRS") timely assessed the taxes, penalties, and interest previously described. Such assessments were paid by the respective Plaintiffs on April 5, 1976. On May 10, 1976, each Plaintiff timely filed claims for refund of the amounts paid with respect to each taxable period.

5. This suit was timely commenced on March 31, 1977.

### Return of the Contribution

6. In 1967, officials of the Southern Methodist University School of Law (hereinafter referred to as the "Law School"), approached Underwood concerning the need to build a new library at the Law School and Underwood agreed to support the building program by contributing $1,000,000 payable over ten years at $100,000 per year. At the time of making his commitment, Underwood and all parties agreed that his commitment was conditioned upon his being able to deduct all of his contributions for the Law School for federal income tax purposes.

7. Because Underwood's income varies considerably from year to year, it was important to find a means of insuring that the Law School would receive at least $100,000 per year even though Underwood's maximum charitable income tax deduction in a particular year might be less than that amount. Underwood and Charles O. Galvin (hereinafter referred to as "Galvin"), Dean of the Law School, who was acting on behalf of Southern Methodist University and the Law School in this matter, decided that a tax-exempt foundation would be suitable for this purpose and the Underwood Foundation was thus established to receive Underwood's contributions for the Law School.

8. In 1967, Underwood made a cash contribution to the Foundation of $37,500. Un-

derwood claimed a $37,500 charitable income tax deduction with respect to this contribution on his personal income tax return for the year 1967.

9. On January 5, 1968, Underwood made a gift to the Foundation of a parcel of real estate located in Grapevine, Texas, having a fair market value of $60,000. Underwood claimed a $60,000 charitable income tax deduction with respect to this contribution on his personal income tax return for the year 1968. On this same date, Underwood executed and delivered a deed of this property conveying title to the Foundation. Underwood's signature on the deed was notarized and the deed was recorded on January 22, 1968.

10. On January 5, 1968, Underwood wrote a letter to Galvin and stated that he had donated and deeded to the Foundation this tract of land. Underwood's purpose in writing this letter was to document the gift for the records of the Foundation.

11. The IRS subsequently determined that $14,657.39 of the 1967 gift and $14,965.33 of the 1968 gift exceeded the maximum that could be deducted, on the grounds that the contributions were made to a private charitable foundation rather than directly to Southern Methodist University for the benefit of the Law School.

12. Pursuant to the understanding that all contributions for the Law School were conditioned upon the contributions being deductible for federal income tax purposes, the Foundation and Underwood entered into an agreement dated October 22, 1971. Pursuant to that agreement, on November 3, 1971, the Foundation returned to Underwood the sum of $29,622.72 (the aggregate amount of the deductions disallowed in 1967 and 1968) with the understanding that it was Underwood's intent to contribute that amount to the Law School and thereby obtain the benefit of the charitable income tax deduction, and on December 13, 1971, Underwood contributed $30,000 to Southern Methodist University for the benefit of the Law School.

13. The IRS determined that the return of the $29,622.72 contribution by the Foundation to Underwood was an act of self-dealing within the meaning of Section 4941 of the Code and, as a result of that determination, the IRS assessed federal excise taxes against Underwood under Section 4941(a)(1) of the Code equal to $1,481.14 (5% × $29,622.72) for each of the years 1971 through 1974.

14. The IRS determined that Underwood's alleged act of self-dealing with respect to the return of the contribution was willful and flagrant and, as a result of that determination, the IRS assessed penalties against Underwood pursuant to Section 6684 of the Code in the amount of $1,481.14 (100% × amount of tax) for each of the years 1971 through 1974.

15. Underwood did not file Form 4720 reporting any liability for excise taxes stemming from the alleged act of self-dealing with respect to the return of the contribution. Because no Form 4720 was filed, the IRS assessed "failure to file" penalties against Underwood pursuant to Section 6651(a)(1) of the Code in the amount of $370.28 (25% × $1,481.14) for each of the years 1971 through 1974.

16. Until July 15, 1975, there was no Treasury Regulation which required an individual liable for a tax imposed by Section 4941 to report such liability on Form 4720.

17. The IRS further determined that the return of the $29,622.72 contribution was a taxable expenditure by the Foundation within the meaning of Section 4945 of the Code and, as a result of that determination, the IRS assessed and collected federal excise taxes of $2,962.72 (10% × $29,622.72) from the Foundation for its taxable year ended May 31, 1972.

18. The Foundation did not file Form 4720 reporting any liability for excise taxes stemming from the alleged taxable expenditure with respect to the return of the contribution. Because no Form 4720 was filed, the IRS assessed "failure to file" penalties against the Foundation pursuant to Section 6651(a)(1) of the Code in the amount of $740.57 (25% × $2,962.72) for its taxable year ended May 31, 1972.

19. Until July 15, 1975, there was no Treasury Regulation which required a private foundation liable for a tax imposed by Section 4945 to report such liability on Form 4720.

### Campbell Road Property

20. In 1964, Underwood and his partner, James L. Embrey (hereinafter "Embrey"), acquired a 17-acre tract of land located at the northwest corner of Central Expressway and Campbell Road in Richardson, Texas.

21. The tract was purchased by Underwood and Embrey from Mrs. Bernice Couch on November 23, 1964. As partial consideration for the purchase, Underwood and Embrey issued their joint note, upon which they were personally liable, to Mrs. Couch in the amount of $175,000. Payment of the note was secured by a deed of trust on the property.

22. Commencing in the summer of 1970, Underwood had discussions with Henry H. Dickerson, Jr. (hereinafter "Dickerson"), a substantial real estate broker in Dallas, Texas, regarding sale of the tract to a joint venture organized by Dickerson. During the course of the discussions, Dickerson said that he believed he could sell approximately 40,000 square feet of the southernmost portion of the tract to Exxon (Humble Oil & Refining Company) for at least $4 a square foot and, conditioned upon that sale, would buy the entire tract. Underwood was agreeable to selling the tract, provided he could obtain the cash proceeds from the sale of the 40,000-square-foot portion to Exxon. Dickerson negotiated an option from Underwood and Embrey to Exxon which was executed and delivered August 28, 1970.

23. On September 14, 1970, Underwood wrote a letter to Galvin as trustee of the Foundation and stated that he was giving his one-half interest in the 40,000-square-foot portion to the Foundation, which, after paying off the small mortgage, "should bring the Foundation about $75,000 net cash." The letter further stated that "[t]his gift consist of my equity in this approximate 40,000 sq. ft. of ground above the stated release clause amount of debt owed to Mr. and Mrs. Couch." Underwood's purpose in writing this letter was to document the gift for the records of the Foundation. Underwood was in the real estate business and was familiar with the drafting and execution of deeds. Underwood did not intend for this letter to constitute a deed. Underwood did not intend for this letter to convey the Campbell Road property to the Foundation; but rather, Underwood's intent, as manifested by his letter, was to give the Foundation his "equity" in the Campbell Road property.

24. At the time Underwood sent the September 14, 1970, letter, Underwood expected that the property would be sold to Exxon within a short time and that the sale of the property would bring the Foundation about $75,000.

25. The letter was not witnessed, notarized, or recorded. No formal deed was ever executed or delivered conveying title to the Foundation. Record title to the property remained in Underwood and Embrey until it was ultimately sold.

26. The Foundation did not sign any document with respect to acceptance of the property. A $75,000 gift with respect to the property was recorded on the books of the Foundation but no amount was recorded in connection with any indebtedness of the Foundation with respect to the property. Underwood did not intend for the Foundation to assume any part of the Couch indebtedness or to pay any amount with respect to the Couch note. The mortgage holders did not, and were not requested to, consent to the assumption of the debt owed to them and secured by the property.

27. On October 20, 1970, Underwood wrote a second letter to Galvin wherein Underwood stated that he intended to suggest to his accountant a value of $75,000 with respect to this gift for his personal income tax return for the year 1970.

28. On his personal income tax return for the year 1970, Underwood claimed a charitable deduction for the gift with respect to the Campbell Road property.

29. The Foundation reported receipt of the Campbell Road property on its Form 990 return for its fiscal year ended May 31, 1971.

30. The IRS determined that the September 14, 1970, letter was a donation of real property subject to a mortgage and that this donation was a sale of property constituting an act of self-dealing within the meaning of Section 4941(a) of the Code. Based on that determination, the IRS assessed against Underwood federal excise taxes in the amount of $234.84 (5% × $4,696.73) for each of the years 1971 through 1974.

31. The IRS determined that Underwood's alleged act of self-dealing with respect to the Campbell Road property gift was willful and flagrant and, as a result of that determination, the IRS assessed penalties against Underwood pursuant to Section 6684 of the Code in the amount of $234.84 (100% × amount of tax) for each of the years 1971 through 1974.

32. Underwood did not file Form 4720 reporting any liability for the excise taxes stemming from the alleged act of self-dealing with respect to the Campbell Road property gift. The IRS assessed "failure to file" penalties against Underwood with respect to this transaction pursuant to Section 6651(a)(1) of the Code in the amount of $58.71 (25% × $234.84) for each of the years 1971 through 1974.

33. On October 28, 1970, Underwood and Embrey executed a contract for sale of the tract to Dickerson, Trustee. The purpose of executing this contract was to give Dickerson standing to apply for the necessary zoning changes with the City of Richardson. The contract provided for sale of the tract for $724,402.80, of which $200,000 would be paid in cash at the closing. The price was computed on the basis of $43,560 per acre times 16.63 acres. The sale was subject to the purchaser obtaining adequate zoning and financing. On November 1, 1970, Exxon allowed to lapse its option to purchase the 40,000-square-foot portion of the property. Sale of the tract under this first contract was never consummated.

34. Dickerson continued with the retail zoning application. On February 16, 1971, Underwood and Embrey granted Texaco, Inc., an option to purchase the southernmost 46,800 square feet of the tract.

35. Shortly thereafter, Underwood and Embrey executed a second contract with Dickerson providing for a sale of the entire tract for $652,000, of which $139,000 was payable at the closing. The contract was subject to the exercise by Texaco of its option. The purchase price was based upon $3.75 per square foot for the southernmost 46,800 square feet, $3 per square foot for the 38,000 square feet to the north thereof, and .5667 cents per square foot for the remainder. This second contract was dated October 28, 1970, the same date as the first contract, because it was desirable that the property be under contract of sale continuously for purposes of the pending zoning application with the City of Richardson.

36. The City of Richardson required that certain water and sewer mains and street pavement be constructed upon property zoned in a local retail district. The Texaco option to purchase was subject to the installation of these improvements and, because Dickerson was required to make these improvements in order to get Texaco to purchase the property, the amount payable under the contract to Underwood and Embrey at closing was reduced, by agreement and without formal modification of the sales contract, from $139,000 to $92,000. The reduction in cash paid at closing was the result of the fact that the expenses to install the improvements required in order to obtain a building permit from the City of Richardson were in excess of the expenses originally projected.

37. The second contract, as amended, was closed and on August 31, 1971, Underwood and Embrey sold the property to Dickerson, Trustee.

38. At closing, Dickerson paid $92,000 in cash and executed a note to Underwood and Embrey in the amount of $567,980.

39. Dickerson had no personal liability on the note to Underwood and Embrey, the

payment of which was secured by a deed of trust on the property. The sale was not subject to the outstanding indebtedness of Underwood and Embrey, but was a wraparound note relieving Dickerson from all liability concerning the note to Mrs. Couch. Underwood and Embrey remained personally liable on the Couch note until they paid the note in full, and neither Dickerson, the Foundation, nor any other person ever became liable on the Couch note.

40. Mrs. Couch's consent was not required for sale of the property, but was required to obtain release of any part of the property from the deed of trust. At closing, Mrs. Couch was paid $30,000 of the $92,000 down payment to secure a release from her vendor's lien on the southernmost three acres (the minimum amount which could be released under the note) of the tract. Part of the three acres released was subsequently sold to Texaco.

41. After deducting the $30,000 paid to Mrs. Couch and the expenses of sale, Underwood and Embrey received $42,058.35. One-half of this amount ($21,029.18) was paid by Underwood to the Foundation on September 2, 1971. An additional $12,500 was paid on October 18, 1971, and $26,470.82 was paid on May 30, 1972. The total received by the Foundation as a result of the sale of the Campbell Road property was, therefore, $60,000. The $60,000 that Underwood paid to the Foundation from the sale of the Campbell Road property was more than the Foundation was entitled to from the sale of the property.

42. Underwood did not take a deduction for the above-described payments to the Foundation on his personal income tax returns for the years 1971 or 1972 and the Foundation did not report receipt of these amounts on its Form 990 for its fiscal year ended May 31, 1972.

43. On his personal income tax return for the year 1971, Underwood reported the installment sale of the Campbell Road property, net of the equity interest which had been conveyed to the Foundation in 1970.

44. On its Form 990 for the fiscal year ended May 31, 1972, the Foundation reported the sale of an interest in the Campbell Road property.

45. The IRS determined that the Foundation's share of the proceeds from the sale of its one-half interest in the 40,000 square feet of the Campbell Road property was $75,000, that its share of the expenses of sale was $2,371.42, and that the Foundation therefore should have received $72,628.58 as the result of the sale. The IRS determined that the alleged reduction in the proceeds from the sale of the property constituted an act of self-dealing within the meaning of Section 4941 of the Code. Based on that determination, the IRS assessed against Underwood federal excise taxes in the amount of $631.43 (5% × ($72,628.58–$60,000)) for each of the years 1971 through 1974.

46. The IRS determined that Underwood's alleged act of self-dealing with respect to this transaction was willful and flagrant and, as a result of this determination, assessed penalties against Underwood pursuant to Section 6684 of the Code in the amount of $631.43 (100% × amount of tax) for each of the years 1971 through 1974.

47. Underwood did not file Form 4720 reporting any liability for excise taxes stemming from the alleged act of self-dealing with respect to the sale of the Campbell Road property. The IRS assessed "failure to file" penalties against Underwood with respect to this transaction pursuant to Section 6651(a)(1) of the Code in the amount of $157.86 (25% × amount of tax assessed) for each of the years 1971 through 1974.

48. The IRS further determined that the proceeds received by the Foundation as a result of the sale of the property constituted "net investment income" to the Foundation within the meaning of Section 4940 of the Code and, as a result of this determination, assessed taxes against the Foundation for the Foundation's fiscal year ended May 31, 1972, in the amount of $2,630.37 (4% × $65,759.51). (The $65,759.51 figure was computed as follows:

| | |
|---|---|
| Sales price | $75,000.00 |
| Basis in hands of Underwood | $5,369.07 |
| Land study cost | 1,500.00 |
| Expense of sale | 2,371.42 |
| | 9,240.49 |
| Gain realized | $65,759.51 |

In making the above computation, the IRS failed to take into consideration additional actual expenses of sale, so that "Expense of sale" should have been computed to be $8,925.57 and "Gain realized" should have been computed to be $59,205.36.)

### Failure to Publish Notice

49. During the years 1971 and 1972 and until August 30, 1973, no notice was published by or on behalf of the Foundation advising that the annual report of the Foundation for the year 1971 was available for public inspection, as required by Section 6104(d) of the Code. The IRS determined that Underwood was the individual responsible for publishing this notice and that the failure to publish was not due to reasonable cause. Based on that determination, the IRS assessed penalties against Underwood pursuant to Section 6652(d) of the Code in the amount of $5,000.

50. Treas. Reg. § 301.6104–4, which sets forth the rules for compliance with Section 6104(d) of the Code, was not adopted until June 7, 1971.

51. During the years 1971 through 1973, Underwood relied in good faith upon his professional advisors to inform him of the need to publish the notice required by Section 6104(d) of the Code, which they did not do.

### Quasi Estoppel, Equitable Recoupment and Setoff

52. The IRS was informed of the facts with respect to the Campbell Road property gift within the statutes of limitation on assessments with respect to the 1970 and 1971 personal income tax returns of Underwood and the Form 990 returns of the Foundation for the fiscal years ended May 31, 1971, and May 31, 1972.

53. On the dates Underwood made the various gifts to the Foundation, the non-deductibility by Underwood of the gifts for federal income tax purposes appeared to be highly improbable.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action and the parties thereto pursuant to the provisions of 28 U.S.C. § 1346(a)(1).

2. Venue is proper in this district under 28 U.S.C. §§ 1402(a)(1) and 1402(a)(2).

■ 3. This Court has jurisdiction to consider Plaintiffs' claims with respect to the fact that there were no Treasury Regulations in effect during the period in question which required a person liable for a tax imposed by Section 4941 or a private foundation liable for a tax imposed by Section 4945 to file Form 4720, or which set forth the rules for compliance with Section 6104(d) of the Code. There is no fatal variance between Plaintiffs' claims for refund and Plaintiffs' claims at trial.

### Return of the Contribution

■ 4. The return by the Foundation to Underwood of the $29,622.72 contribution was not an act of self-dealing by Underwood within the meaning of Section 4941 of the Code. Because Underwood's commitment to the Law School was conditioned upon his being able to deduct all of his contributions for the Law School for federal income tax purposes, when it was subsequently determined by the IRS that $29,622.72 of the contributions made by Underwood to the Foundation were not so deductible, the return by the Foundation of the amount of those contributions which the Foundation should not have received and which it was not entitled to keep is not a "transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a private foundation" within the meaning of Section 4941(d)(1)(E) of the Code.

■ 5. The condition that all contributions made by Underwood for the Law School would be deductible for federal income tax purposes was not void as against public policy.

6. The IRS wrongfully, erroneously and illegally collected from Underwood federal excise taxes for self-dealing with respect to the return of the contribution in the amount of $1,481.84 for each of the years 1971 through 1974.

7. Because no act of self-dealing occurred with respect to the return of the contribution, such act was not a willful and flagrant violation of the Code.

8. The IRS wrongfully, erroneously and illegally collected from Underwood "willful and flagrant" penalties with respect to the return of the contribution in the amount of $1,481.14 for each of the years 1971 through 1974.

9. The failure by Underwood to file Form 4720 reporting liability for excise taxes stemming from the alleged act of self-dealing by Underwood with respect to the return of the contribution was proper because no act of self-dealing occurred.

10. The IRS wrongfully, erroneously and illegally collected from Underwood "failure to file" penalties with respect to the return of the contribution in the amount of $370.28 for each of the years 1971 through 1974.

█ 11. The return by the Foundation to Underwood of the $29,622.72 contribution was not a taxable expenditure by the Foundation within the meaning of Section 4945 of the Code. Because Underwood's commitment to the Law School was conditioned upon his being able to deduct all of his contributions for the Law School for federal income tax purposes, when it was subsequently determined by the IRS that $29,622.72 of the contributions made by Underwood to the Foundation were not so deductible, the return by the Foundation of the amount of those contributions which the Foundation should not have received and which it was not entitled to keep is not an "amount paid or incurred by a private foundation" within the meaning of Section 4945 of the Code.

12. The IRS wrongfully, erroneously and illegally collected from the Foundation federal excise taxes for a taxable expenditure with respect to the return of the contribution in the amount of $2,962.27 for its taxable year ending May 31, 1972.

13. The failure by the Foundation to file Form 4720 reporting liability for excise taxes stemming from the alleged taxable expenditure by the Foundation with respect to the return of the contribution was proper because no taxable expenditure occurred.

14. The IRS wrongfully, erroneously and illegally collected from the Foundation "failure to file" penalties with respect to the return of the contribution in the amount of $740.51 for its taxable year ended May 31, 1972.

### Campbell Road Property

█ 15. The September 14, 1970, letter from Underwood to Galvin as Trustee of the Foundation did not constitute a conveyance of legal title to the Campbell Road property, but only equitable title was conveyed.

16. The IRS wrongfully, erroneously and illegally collected from Underwood federal excise taxes for self-dealing with respect to the Campbell Road property gift in the amount of $234.84 for each of the years 1971 through 1974.

17. Because no act of self-dealing occurred with respect to the Campbell Road property gift, such act was not a willful and flagrant violation of the Code.

18. The IRS wrongfully, erroneously and illegally collected from Underwood "willful and flagrant" penalties with respect to the Campbell Road property gift in the amount of $234.84 for each of the years 1971 through 1974.

19. The failure by Underwood to file Form 4720 reporting liability for excise taxes stemming from the alleged act of self-dealing by Underwood with respect to the Campbell Road property gift was proper because no act of self-dealing occurred.

20. The IRS wrongfully, erroneously and illegally collected from Underwood "failure to file" penalties with respect to the Campbell Road property gift in the amount of $58.71 for each of the years 1971 through 1974.

█ 21. The alleged reduction in the proceeds from the sale of the Campbell Road property from $75,000 to $60,000 is not a "transfer to, or use by or for the benefit of, a disqualified person of the in-

come or assets of a private foundation" within the meaning of Section 4941 of the Code because Underwood never conveyed the Campbell Road property to the Foundation and the Foundation, therefore, had no pro rata interest in the cash and notes received from the sale of the property.

22. The IRS wrongfully, erroneously and illegally collected from Underwood federal excise taxes for self-dealing with respect to the sale of the Campbell Road property in the amount of $631.43 for each of the years 1971 through 1974.

23. Because no act of self-dealing occurred with respect to the sale of the Campbell Road property, such act was not a willful and flagrant violation of the Code.

24. The IRS wrongfully, erroneously and illegally collected from Underwood "willful and flagrant" penalties with respect to the sale of the Campbell Road property in the amount of $631.43 for each of the years 1971 through 1974.

25. The failure by Underwood to file Form 4720 reporting liability for excise taxes stemming from the alleged act of self-dealing by Underwood with respect to the sale of the Campbell Road property was proper because no act of self-dealing occurred.

26. The IRS wrongfully, erroneously and illegally collected from Underwood "failure to file" penalties with respect to the sale of the Campbell Road property in the amount of $157.86 for each of the years 1971 through 1974.

27. Because Underwood never conveyed the Campbell Road property to the Foundation, Underwood realized the gain on the sale thereof and the proceeds received by the Foundation as a result of the sale of the property did not constitute "net investment income" to the Foundation under Section 4940 of the Code.

28. The IRS wrongfully, erroneously and illegally collected from the Foundation taxes for net investment income with respect to the sale of the Campbell Road property in the amount of $2,630.37 for its taxable year ended May 31, 1972.

### Failure to Publish Notice

29. The failure by Underwood to publish notice prior to August 30, 1973, that the annual report of the Foundation for the year 1971 was available for public inspection was not due to reasonable cause in that it is well established that the filing of a tax return is a personal non-delegable duty on the part of the taxpayer. Notwithstanding the fact that Underwood relied in good faith upon his professional advisors to inform him of the need to publish such notice, which they did not do, Underwood remains responsible for compliance with the Code.

30. The IRS was legally entitled to assess penalties against Underwood for failure to publish the notice in the amount of $5,000.

### Quasi Estoppel, Equitable Recoupment and Setoff

31. Underwood and the Foundation are not estopped from asserting that there was no transfer of the Campbell Road property from Underwood to the Foundation.

32. The United States is not entitled to equitable recoupment against the refunds due Underwood and the Foundation of the tax benefit realized by Underwood from the charitable deduction claimed for the gift with respect to the Campbell Road property.

33. Because the charitable deductions claimed by Underwood with respect to the conditional gifts made to the Foundation were allowable, the United States is not entitled to equitable recoupment against the refund due Underwood of the tax benefit realized by Underwood for such gifts.

34. Underwood and the Foundation are entitled to judgment in their favor accordingly.